We'll call next Dzielak v. Whirlpool Corporation, numbers 20-2551 and 20-2661. I hope someone can educate us on how to pronounce the last name. Do we have counsel present? I see three on the screen. Okay. Do we have everybody participating remotely today? Yes, Your Honor. Yes, Your Honor. Yes, Your Honor. And thank you for that. And we'll start with Mr. DeCant. Thank you, Your Honor. Good morning. May it please the Court, I'm Neil Beckin of Bursar and Fisher, class counsel for plaintiffs' appellants. By the way, indeed, you got it right. It is pronounced Dzielak. Now, I will admit, I may from time to time say Dzielak. I myself slip up. In any event, I would like to reserve three minutes for rebuttal. Granted. Thank you. There's been a lot of briefing on this case, as the Court is well aware. So just very, very quick high-level summary. This case is a Rule 23 consumer class action. The plaintiffs are consumer purchasers of Maytag Centennial brand washing machines marked with the ENERGY STAR logo, who alleged the washers were disqualified from the ENERGY STAR program for failing to meet program standards for energy efficiency. I think we're familiar. Indeed. Now, relevant to this case, I also assume you're familiar with the ENERGY STAR program, but it does bear repeating, relevant to the case, that the ENERGY STAR program is a voluntary labeling program. And at the time it issued here, manufacturers tested their own appliances for energy efficiency. But then the DOE was in charge of enforcement and testing compliance. The DOE could come in and they can do audit tests, essentially, to see if appliances really met ENERGY STAR standards. And if not, there's a sequence of events where the DOE can notify manufacturers that, in fact, the appliances failed to meet standards, and then they can refer the washers or appliances to the Environmental Protection Agency for enforcement. I'm having difficulty understanding because this is not a DOE enforcement. This is a warranty claim. So this is a warranty claim brought by purchasers. And it's under New Jersey law, not under the APA or anything. So the ultimate test is, were they misled or not? Do you have any evidence that the buyers understood the ENERGY STAR logo promised compliance with Not up to the lid. Well, Your Honor, our clients, in fact, you're correct. They bring warranty claims. They are reasonable consumer purchasers. Our lead plaintiffs here are not electrical engineers. They're not washing machine experts. None of them in a deposition said anything about lid versus top of basket. Our clients were not familiar at deposition about the intricate mechanics of the J01 test procedure, but I would liken this. There was one who said something about 50% more efficient in electricity and 37% savings, but none of the others had any numerical benchmark for what ENERGY STAR meant. Correct? Correct. You're referring to Plaintiff Christy, who said that she understood there to be a 50% savings in water and 37% savings on electricity, and Plaintiff Christy got it right. But you don't have a case for commonality or typicality if your case hinges on that. Your case has to be more general. They understood that this would be substantially more energy efficient. Yes. Our clients understood ENERGY STAR to mean that the washers met the program requirements of the ENERGY STAR program, though I note that's also how Whirlpool viewed it as well. Whirlpool in 2009 issued a Maytag laundry product catalog where they say, quote, all Maytag washers with the ENERGY STAR emblem meet or exceed energy efficiency standards set forth by the Department of Energy. At the time, they, in fact, got the sticker. They didn't steal these stickers. They didn't forge them. They got it, and Whirlpool was corresponding with them about which fill load. It's not until May 2012 they get disqualified. So you've got two possible theories. One is they were not, in fact, ENERGY STAR certified, and it seems like, well, they had it at the time. And the other possibility is they were not, in fact, substantially more efficient, and the problem you've got with that is they were substantially more efficient. Maybe they just didn't quite reach to the 50%, 37% levels. So what do you say about those two ways in which you could prove that this was a breach of warranty? Right. Starting with the second question, Your Honor, about whether or not the washers were nearly as efficient as ENERGY STAR, it's undisputed that when the EPA disqualified the washers in 2012, for the test procedures, they were 7% under in utilities. It's a question of fact for the jury whether being 7% under in utilities constitutes a breach. I don't think that should be decided as a matter of law. We're talking about an appliance with a 10- or 11-year life cycle. Utility bills add up over time. We ran multiple consumer surveys. But the difficulty is your clients, you have only one client who mentioned these numbers. So you don't have commonality or typicality if we're going to insist on a 50% benchmark, right? You have to just have a substantial benchmark here, and they're at, what, 45% or something. So how in the world can this survive as a class action and not just an action by the one person who claims to believe it was 50% more efficient? Let me give you an analogy. 24-carat gold, right? Let's say a consumer purchaser goes to a jewelry store. Let's say there's a national jewelry chain selling 24-carat gold rings. Numerous people buy these 24-carat gold rings. There's later a government audit. They find it's not 24-carat. Whatever enforcement, the FTC does testing. It's not 24-carat. It's 16-carat. Now, I personally, I don't know how carats are measured. I think if you were to flag down 100 people in the street and ask them how carats are measured in gold, they wouldn't exactly know. But they would understand 24-carat is a signifier as the purity of gold. Similarly, let's say 500-milligram acetaminophen pills. Let's say a manufacturer is found by the FDA to own the pills instead of 500 milligrams, 450 milligrams acetaminophen. Now, when perhaps consumer purchasers, when they purchase the pills, they don't know the exact test procedures. They don't know how to weigh acetaminophen, test its mass. When they see that, they can rely upon the fact that it should contain that much acetaminophen. Here, ENERGY STAR is supposed to be an easy-to-understand consumer logo. That's why it has some of the highest levels of consumer understanding. Going at Judge Bevis' question a different way, what is your position as to the precise affirmation or promise that was being made via the STAR? And why shouldn't we follow the thinking of the SAVID court to say that what's being represented is simply the idea that the government had given its approval to the appliance, which it had? Right. I'd like to note, I will cut right to that question. I would like to note, though, there's, in the prior question as well, under the regulatory protocol at the time the washes were sold, it's a test program where appliance manufacturers test their own appliances and they label it with the ENERGY STAR label. Now, they can be later disqualified by the EPA, but it's the honor system. The government at the time does not grant a license. They do not confer a license. You test your own washers. If they meet program standards, you put that ENERGY STAR logo on. Now, if they're found to be lacking, yes, the EPA can disqualify the washers from the program, but it's not a pre-license testing routine. Now, to answer your question, Your Honor, we hold that consumer purchasers understood the ENERGY STAR logo quite simply to mean that the washers met the requirements of the ENERGY STAR program, meaning an efficient appliance. I note, again, this Maytag 2009 Maytag laundry product catalog where that's exactly how Maytag and Whirlpool define it as well. They say all Maytag washers with the ENERGY STAR emblem meet or exceed energy efficiency standards set forth by the Department of Energy. As a general matter, it was more efficient, right? I mean, for your theory to hold, you need us to accept that the representation was a much more technical representation as to certain specifications, right? Well, respectfully, I don't agree that the washers were more efficient than a standard model, and I also don't agree that they met program standards. First point, there's a January 19, 2011 letter referenced in our briefing from the Department of Energy that says our testing confirms the clothes washer model, MVWC6ESWW1, does not satisfy the ENERGY STAR program's energy efficiency specifications. There's a second letter, March 16, 2011. Stage 2 testing also indicated that same model does not meet the ENERGY STAR requirements. That's the EPA's disqualification. They say we're disqualifying this washer because, quote, it failed to meet the ENERGY STAR requirements during testing, unquote. But those are specifications. You made a statement earlier that there's evidence on this record that it wasn't even more efficient than standard models. Where is that, that it wasn't even more efficient at all? Your Honor, that is, let's see, that is referenced. I'll give you a page site of the briefing. One moment, please. This is the issue of relative efficiency, Your Honor. This is discussed in our briefing that upon reconsideration, the district court held that summary judgment was appropriate because the washers were largely efficient or more efficient than standard washers. I disagree. The reason I disagree is that there's a minimum, and this is discussed in the briefing, I don't have a page site handy at this moment, but there is a minimum standard of efficiency for washers to be legal for sale in the U.S. That's set by the National Appliance Energy Conservation Act of 1987. Under the ENERGY STAR guidelines at the time of sale, the washers had to be 37 percent more efficient in electricity use and 50 percent more efficient in water use. Now, Whirlpool on page 19 to 20 says, I believe the moving brief, we raised the argument. Whirlpool argued that the washers, yes, as the EPA found in 2012, they were not 50 percent more efficient in water usage. They were 46.1 percent more efficient in water, and they were not 37 percent less efficient in electricity. They were 34.3 percent more efficient in electricity. I note that there's a standard range for washers to be legal for sale between the NA, excuse me, for washers to be legal for sale, they have to be above the NAECA's minimum thresholds. To be ENERGY STAR, they have to meet a higher threshold. Okay. Yes. Let's talk about the, you've been referring to a bunch of things that were said in 2011 by agencies. But Whirlpool points out some correspondence with DOE that said, yes, this is the way we're testing it, level four is fine. Your clients bought between November 2009, December 2010, before the correspondence you're referencing that might then have put Whirlpool on notice, the plaintiffs on notice, whoever. So isn't, how can we retroactively say that this affected what your clients' expectations reasonably were at the time they bought? Because quite simply, the EPA and the DOE later found that they did not meet ENERGY STAR program requirements. They later found that. How can that be a warranty if it wasn't made until afterwards? This is just like my hypothetical where an individual goes into a national jewelry chain, buys a 24-karat gold ring, government testing by the FTC later finds out it's 16 karats. It's not accurate to say it's 24 karats. It's not really like your hypothetical because originally there was an ambiguity in the degree of federal regulation in terms of whether this was set at fill level three or fill level four. And so for your analogy or your hypothetical to work, you would have to say there were competing definitions of 24-karat gold and the government later changed its mind or brought clarity to that. It strikes me that you've got a fundamental problem which is saying that there was a misrepresentation or a breach of a warranty when at its core, there's an ambiguity here. And an ambiguity forces a retailer to make a choice. They either have to say we're going to test at fill level three or we're going to test at fill level four. But they made a choice. And since it's a self-certified regime, it's not a pre-licensed regime, nothing says at the time that that was a bad choice. So at one level, it might have said so later, but at least at the time, there was approval for this method. So the real problem is I get it that maybe if they said we all agree on what the standards are, but there was an agreement. And so in order to prevail, at least as I see it, you need to establish that this ambiguity didn't exist at the time that these sales were taking place. And I don't see you doing that. I can do it right now, Your Honor. So I disagree that there is an ambiguity. In 1996, there's a trade organization of appliance manufacturers, AHAM. Appendix 996, AHAM, which has SS members, Whirlpool, it said that AHAM believed the test procedures require measuring the capacity to the uppermost part of the closed washer container at fill level three. And that all manufacturers, including Maytag, believe that the current method for measuring vertical access closed washer capacity is sufficient and should not be changed. And prior to 2004, Maytag itself measured the capacity of its washing machines at the uppermost part of the closed container, fill level three, A996. Maytag only adopted the approach of measuring... I'm going to ask you to hold for one second, because we've got a ringing sound going here, and we want to be able to focus on what you're saying. Thank you. I'm not sure whose phone that's coming from, but... Can we turn that off? If it's on our end, can we turn it off? And if it's on others, can you mute? All right. Okay, it seems to have stopped. Okay, so there's a trade organization, AHAM, Whirlpool's a member, and in 1996, they recommended the test procedures require measuring the capacity to the uppermost part of the closed container, that's Appendix 996, and that all manufacturers, including Maytag, believe that the current method for measuring vertical access closed container capacity is sufficient and should not be changed. Prior to 2004, Maytag itself measured the capacity of its own washing machines at the uppermost part of the closed container, which is fill level three, A996. Maytag only adopted the approach of measuring to the top of the tub cover, fill level four, in 2004, which was, quote, designed to result in an approximate increase in rated capacity, A996. I also note the DOE's July 2010 guidance. There's nothing in this guidance at all that says the DOE found that it's confusing or ambiguous. It simply says that its answer is intended to clarify the department's views on measuring the closed container capacity. The DOE noted its interpretive rule, and is therefore exempt from the notice and comment requirements of the Administrative Procedure Act. It's further noted that the general requirements for measuring the closed container capacity of a washer are found in the CFR. Let me just get in on this, though, because if it's necessary to issue an interpretive rule, right, you don't need to issue an interpretive rule when something is unambiguous. There's no need to interpret anything, right? It's unambiguous. And so doesn't the fact that you're claiming that they issued an interpretive rule necessitate an ambiguity? I believe the Department of Energy, just as they write, was issuing additional guidance on how to properly measure. I also find that there's... But there's no need for additional guidance if it was already clear. I don't believe the fact that an interpretive rule offering guidance on regulatory compliance means the regulation was confusing or ambiguous in any way. I mean, the AHAM trade organization got together. They agreed on how to test it. Maytag itself was testing at fill level 3 prior to 2004. Maytag's actions at testing at fill level 4 was an extreme outlier here. It was contrary to AHAM. In administrative law, there's something called an anti-parroting canon. And it says that when a regulation simply parrots a statute, it has basically no force of law because it is parroting what's in a statute. And so that means in order for an interpretive rule to have any value whatsoever, it can't just say something that's already said. So it suggests that you can't issue an interpretive rule that has any value unless there's something that you need to clarify. And that something would be an ambiguity. I don't think... I read the DOE's July 2010 guidance at face value. The statement provides manufacturers with additional guidance on this issue. The general requirements for measuring the closed container capacity of a closed washer are found in 10 CFR Part 430. Which states, by the way, I should just get this on the record. It's one sentence. It says, closed container means the compartment within the closed washer that holds the close during the operation of the machine. So in July 2010, the DOE said, well, what does it mean, the compartment within the closed container that holds the close? Well, that is literally the top of the closed container. It's not the space between the... an interpretive rule because it would be merely clarifying, doesn't raise retroactivity issues. But we still, and under the Levy case that was cited by both parties, we still take a look to see if the change itself was, in fact, whatever it's deemed in terms of interpretive or not, it's actually clarifying or it's substantive. And in making that determination, we also look to things like whether it was ambiguous and the prior position that was taken by the agency. Where there was a prior representation on the part of Mr. Berringer, seemingly on behalf of DOE, that approved the way that Whirlpool had been proceeding, wouldn't this, if it were an administrative enforcement action, wouldn't it be impermissibly retroactive? And if so, why would we nonetheless export to the warranty context the ability to retroactively create liability? Well, number one, that petition that Whirlpool sent in to Mr. Berringer, it was never actually granted. Whirlpool also acknowledged in that petition that fill level three may be correct. It said the J-1 procedure, i.e., the relevant test for ENERGY STAR compliance, could be interpreted to permit measurement of a closed container capacity to coincide with the upper rim of a closed basket, i.e., fill level three. When Whirlpool wrote the petition, they acknowledged fill level three may be correct. That's an extraordinarily reasonable reading of the J-1 test procedure under the CFR. But they disclosed to the department what methodology they were actually using, and Mr. Berringer's letter confirms that that meets the specifications. Why did they rely on that? He did write that letter, I acknowledge. I note, though, that the petition was not granted, so I believe they should have proceeded with caution. And again, I have to stress, they were deviating from the widespread industry practice of AHAM. They were deviating from their own practice prior to 2004. We have evidence that AHAM, Whirlpool itself, Maytag, they were testing their washers at fill level three. Why write a petition? Why write a petition if fill level four is the correct fill level? Mr. Decken, before we let you go, you don't seem to have preserved your implied warranty and unjust enrichment claims. Didn't you forfeit those? Do you have any argument that you've preserved them on appeal? I did not forfeit them. The district court, when it granted some re-judgments, did so under the breach prong of express warranty. But the same rationale, i.e., there is no breach, there is no injury, because, you know, in the district court's view, the washers were all properly Energy Star at the time of sale. The district court used that common reasoning to dismiss all of our claims. So by challenging that issue on appeal, I am seeking to preserve the implied warranty and unjust enrichment claim. I know that implied warranty under the UCC 2-304, it does require products to be properly labeled and to live up the representations on the product packaging. So that's one in the same with express warranty. It was common reasoning upon which the district court dismissed all of our claims in one fell swoop. Okay. Thank you. We'll come back to you in rebuttal, and we'll hear from Mr. Saywell. Thank you, and may it please the Court. James Saywell for Whirlpool. In plaintiff's myopic focus on this administrative law theory of their case, they lose sight of the basics of express warranty law, consumer protection law, and of the Energy Star program itself. The district court understood those basics, and the basics are this. At the time each one of these washers was labeled and sold, it delivered energy and water efficiency, and it was designated by the government itself as qualified for the Energy Star program. That means that summary judgment is proper, even if there were an express warranty or an express statement of fact by the Energy Star logo. This court should affirm the district court's grant of summary judgment. But before it does, the court does need to resolve the motion to dismiss, and I would, with the court's permission, like to say a brief word on that. We do believe that as the appeal is currently constituted, there has been no final judgment because the judgment as to Sears, which is in a bank, which was and is in a bankruptcy state, cannot render, cannot be finalized to Sears. That's under well-established Third Circuit precedent, like Tubbs and Maritime Electric. If the court agrees with that, then the proper procedure would be under in-rank FOSAMAX, which would be to require the plaintiff. How can that be so when the claims were abandoned? Well, Your Honor, we're happy to have the court say that and then to reach the merits. We're almost as an amicus in this posture because we want the court to reach the merits as well. So if the court does say that the plaintiffs can abandon their claims after there's been an appeal, we accept that. The reason, again, in that kind of amicus posture that we find ourselves in here, the reason we don't think that's proper is because an abandonment on appeal does not retroactively render what wasn't a final judgment a final judgment, which is to say when the district court granted judgment, it couldn't have taken any action as to Sears. And abandoning after that point doesn't go back in time and make what wasn't final, final. So let me just ask this question about the nature of the automatic stay. If I understand an automatic stay, it stays all proceedings involving the debtor from being commenced or continued, right? And so this is basically to freeze everything against the debtor. At one level to give them, quote, a sigh of relief, the case law says, and at one level to allow an accounting of kind of all of the assets and liabilities that may be facing the estate. But an abandonment of a claim, if we allow that, which our case law seems to, Hafer v. Mello says as much, but if we allow an abandonment of a claim that seems to be outside the scope of an automatic stay, which is focused on commencement or continuation, not dropping, not letting go. And so to the extent that this abandonment strand exists in our case law, wouldn't it also apply to the automatic stay or is there something about the automatic stay that's different? I do think there's something about the automatic stay that's different, but again, I don't want to push too hard on this. We happily accept the abandonment if the court will allow it. The reason I do think that an automatic stay is different is because it doesn't even allow a party to take an action. Maritime Electric, I think, is the best case on that. The court held, this court held, that the party's motions were void. But there is a split about whether under Rule 41 a party can voluntarily drop its claims at the district court. That's not what happened here. We think that once the court purported to enter judgment, that was continuing the claim as to Cedars, and that's what was impermissible. And so if I infer from what you're saying, you're saying that because sometimes the automatic stay even prevents the dismissal of an action under Rule 41, that it would not allow an abandonment of a claim against a party. Is that right? I think that's right, Your Honor, and my key point is really when it happened. It's a lot more straightforward if it happens before a judgment, but if it happens after a judgment, which we believe under Tubbs and Maritime Electric in a number of cases, the judgment wasn't final. If it happens afterward, it doesn't go back in time and make what was a non-final judgment into a final judgment. I apologize for the interruption. This is Greg of Resume. It looks like we've lost appellant counsel, so if you could just hold for a moment, please. We'll make sure that he gets reconnected. Thank you. Mr. Decken, is that you over the phone? Yes. My Zoom just crashed. Okay. All right. So we do have Mr. Decken back on as an audio participant. Mr. Jenkins, are you trying to get back on by Zoom, or are you prepared to proceed simply by audio? My Zoom just crashed. I am trying to dial back into Zoom, but I'm okay with proceeding by audio in the meantime. I don't want to delay the court. Okay. I think we had just lost you a moment before, but why don't we rewind by a moment. Well, I'm happy, Your Honors, to use that as an opportunity to move to the merits, which we care much more about, and which our whole point on the motion to dismiss at this stage is, regardless of what the court thinks about it, it should ultimately decide the merits, either after Rule 54B. Some courts have limited remands for a 54B if the court determines it, and then it can decide the merits so that this court and the parties do not waste resources. So turning to the merits, if I could. The key first step, which, with respect, my friend on the other side skips past a little bit, is defining the terms of the warranty or defining the statement of fact at issue. And when you have a blue logo with the words ENERGY STAR on it, that is a difficult first step. It is not like an unambiguous statement of work and material defects are covered by the warranty or something like that, which this court sees and resolves pretty frequently. The first step is to figure out what was actually meant, what was implied by the warranty. And, of course, plaintiffs here are pushing express warranty claims, which makes that even more important. So we hear, I think, plaintiffs set out a few different theories of the bargain, of their understanding of the warranty. The first one that Your Honor, Judge Bevis raised is this efficiency theory. So on appeal, they did call that theory totally irrelevant to their case. So I do think that at this point it seems like now they're trying to go back and revive that. But they did expressly abandon that on appeal. But to the extent they did not, this court's questions were correct that there was energy and water efficiency delivered by these washers under any test procedure. Dr. Fessler, in the record, Supplemental Appendix 372, tests these washers using plaintiff's preferred method and finds that they deliver 92 and 93 percent of the energy efficiency, even compared to those benchmarks set by the Energy Start program. So they meet that understanding of the bargain, assuming that that is the bargain that plaintiffs are advancing on appeal. Your Honor, you would have to sort of gloss over the specifics and to really have a clear line between the express warranty theory and administrative law. But where we're dealing with an administrative program and one that involves specifications that have been laid out for the government with this symbol indicating that there has been compliance, why aren't consumers entitled to rely on that relationship between the government and its regulations and manufacturer that when they see that, it has met with the specifications that were set by the government? Why isn't that what's communicated even to a layperson as a consumer? Well, if that is, Your Honor, what is communicated, Whirlpool met that theory of the bargain as well. The government itself said that these were qualified in their January 2011 letter that my friend on the other side focuses on in that very letter, that that was after every one of the washers was manufactured. The government says these washers will remain designated as Energy Start qualified. So to the extent that that is the theory of the bargain, there was no breach there either, which is exactly what the district court held. But getting back to the premise of your question, which is maybe that Whirlpool somehow disagrees with that, the reason we would disagree with some kind of hyper-technical understanding would be that there's a lack of evidence in the record that any plaintiff understood it that way. The closest anyone gets, I'll come back to Christy, but the closest any plaintiff gets to this Energy Start qualified theory is that it's backed or approved by the government, which it was. So plaintiffs, and plaintiffs concede that at Blue Brief 55, which is their first step brief, 55, they say that the government allowed the washers to be labeled with the Energy Start logo. They need it to be something more than that it was labeled, because if it were just that, there's no breach, that Whirlpool was in fact allowed to label them throughout the whole process. Only after disqualification, which the EPA and DOE are very careful about doing, they work with the manufacturers before disqualifying the program. They have control of this program. Sometimes they even allow a manufacturer to phase out a product, even when it's labeled Energy Start, because they're in charge of the program. What plaintiffs are doing, I think, Your Honor, is trying to essentially infer a private right of action from these hypertechnical J1 test procedures, which is an implied right of action on steroids. It's not – these regulations are not rights-conferring regulations. To the contrary, they are extremely technical and internally focused, telling the manufacturers, third-party certifiers, and ultimately the government how to measure a clothes washer test capacity, the fill level. And to Judge Fitz's question about the ambiguity, Your Honor, if that is the fundamental problem and Whirlpool prevails if there was an ambiguity, Whirlpool definitely prevails, because I think, if anything, there was a lack of ambiguity going toward Whirlpool's favor, because, well, first of all, there was a genuine ambiguity in the industry leading up to 2007, and this is reflected in Whirlpool's internal documents at the time. These are not lawyers debating how to measure this or how to get around the Energy Start programs. These are engineers at Whirlpool and Maytag going back and forth with PowerPoint slides and trying to figure out the proper fill level. And then what happens is Whirlpool reaches out as a responsible manufacturer and a responsible partner in the Energy Start program. It reaches out to the government in this petition for waiver, and Brian Barringer of the Department of Energy responds at page 851 of the record that he agrees with Whirlpool's proposed interpretation to fill level 4. Whirlpool's letter, which is really worth reading from pages 845 to 850, it shows not a fraudster or a huckster. It shows a partner committed to the program and genuinely trying to figure out what to do. Whatever the government told Whirlpool it would do, Whirlpool would do. And Mr. Barringer, who's the representative for the government for exactly this petition for waiver, responds that he agrees with the interpretation. Sorry, you go ahead. It strikes me that you have this kind of you're taking two approaches on the warranty point. One, you're saying we don't think a logo can ever really be a basis for a warranty. But Judge Krause asked you, and at least the gist of the question that she asked suggested that, well, maybe when a logo acts as an indicator that you're in compliance with a government regulatory program, then that logo means something more than just a logo that might be, for instance, a common brand logo. But it seems, though, that if it does act as a warranty, that strengthens then your breach case because you say the extent it says we're in compliance, we have these letters from the Department of Energy saying that we are in compliance. And so it seems that when you say that it means something, it can't be its own warranty that almost cuts against and diminishes the evidence that the Department of Energy said that you were in compliance. I see Your Honor's point, and I'll explain why we're not trying to have it both ways. But to Your Honor's point about the page 58 of the district court's reconsideration motion, that's exactly what the district court said, not about us having it both ways, but about it being a warranty and there being no breach. And the district court called it a tradeoff. We call it in our brief a rock-and-hard-place problem. But the tradeoff is if it is a warranty, it can be only this generic warranty for an energy-efficient product, which these were. But to the point about why are we disputing that it's a warranty, I think we're disputing that it's an express warranty. We're not necessarily disputing that it implies something about the product. I do think it implies, and rule thinks that it implies, an energy-efficient product. That's why they label it that way. And it also does, I think, imply that some sort of government backing on the program. If a manufacturer is willy-nilly labeling their washers or whatever product with Energy Star, that would be a problem. If it's doing so knowingly, it could well violate the consumer protection statutes. But the reason why we're making a deal of whether it's a warranty is whether it is an express warranty, and moreover what the express warranty is for. If it's for anything more specific than an energy-efficient product or one that is, you know, one that may be labeled by the government, plaintiffs run into a real problem on prong one on defining the terms of the bargain. And that's what the district court itself held, is that they can pass prong one only by defining the warranty broadly. I hope that helps answer Your Honor's question. I don't know if you two want to stay on this point. I have a couple of different points I'd like to raise with you, Mr. Saywalt. One of them is your preemption argument under 42 U.S.C. 6297G, but Energy Star is an optional program, and that preemption applies only to, quote, any disclosure, dot, dot, dot, required to be made. How can an optional program be something that's required to be made? How can there be preemption? We are not arguing for preemption, Your Honor. In fact, we lost that point, and we are not. We didn't cross appeal or raise that as an alternative ground. Our point there, Your Honor, is that the energy guide label, which sets out the specific amount of estimated utilities costs that a consumer will gain, that it cannot be an express warranty under federal law under the statute that you're on. But there are two different things. Our issue here is not that energy guide sticker. It's the Energy Star certification, which is something different. Yes, Your Honor. And our point, yes, that's exactly right. And our point deriving from that is, if not even the specific representation about the amount of utility savings and the amount of energy costs that you are going to be gaining in the energy guide label is a warranty, how can it be that a generic blue star is some sort of hyper-technical or specific express warranty for utility savings, for a certain amount of utility savings, for example? We think that it follows from that the energy guide label cannot be a warranty, that the Energy Star logo cannot be at least an express warranty. Perhaps it could be an implied warranty. Okay. Could I ask you to respond to your friend's efforts to preserve the implied warranty and unjust enrichment claims on appeal by saying that, well, they all have the same premise, so by appealing he's preserving all three. What do you say about that? Is that enough for preservation? With respect to my friend, no, it's not enough. It's not even close enough. The federal rules of appellate procedure require in the issue statement itself to contain a reference, you know, the question presented, the issue presented, and there is nothing in the issue statement that raises implied warranty or unjust enrichment. In fact, in the issue statement it uses the words express warranty. It doesn't even say warranty generally. And then way beyond that, so that's somewhat of a technical requirement, although I know courts often enforce that requirement, and I think we cite a case called Coast that enforces that requirement from this court. But then beyond that, there's no argument in the opening brief that the implied warranty has to do with implied warranty and unjust enrichment. And I think for good reason, although we think that they have a better case to try to make out that the Energy Star warranty, or sorry, the Energy Star logo is an implied warranty rather than an express. There's problems, especially as to Whirlpool, for privity, for example, and also problems under New Jersey law for implied warranty because it is a much more, it's a much easier standard to overcome. So we think that there's a reason why plaintiffs haven't pressed that here. No argument is not raised in their issue statement. Okay. Okay. Thank you. Thank you, Your Honor. And we understand that there is one minute. Mr. Haskins, if you've asked for, we've been generous with time, so you can have a couple minutes since you've taken the time to prepare to be with us. Thank you, Your Honor. May it please the Court, Stuart Haskins on behalf of Home Depot. I argue briefly today just to emphasize that the Court should affirm the district court's grant of summary judgment to Home Depot and the other retailers as well, no matter how it decides the issues that plaintiffs' appellants have raised on appeal. And that is because those issues will not affect the district court's decision that the retailers made no representations about the ENERGY STAR status of their washers. Now, the district court found that the only representations made to the plaintiffs about the ENERGY STAR status of their washers was the ENERGY STAR logo and the ENERGY GUIDE label. But the court found that those emblems were not attributable to the retailers, who didn't affix them to the machines in the first place, and the plaintiffs do not challenge that conclusion on appeal. And because the plaintiffs haven't challenged that conclusion, then the district court's finding that the retailers made no representations about the washers' ENERGY STAR status, then the plaintiffs can't identify any warranty, falsity, or misrepresentation made by the retailers. And as a result, their claim for both a breach of express warranty and a violation of any state consumer protection statute would necessarily fail. With respect to the remaining two claims of unjust enrichment and implied warranty, as the court has noted and as Mr. Saywell explained, the plaintiffs presented no argument or authority in their opening brief supporting their claims for unjust enrichment and breach of implied warranty with respect to Whirlpool or the retailers, and they therefore have abandoned those claims and should not be allowed to try to pursue them now. But even if those claims had not been abandoned, the district court correctly found that there's no dispute that the washers cleaned clothes efficiently. Therefore, the plaintiffs' implied warranty and unjust enrichment claims must fail. I think the district court said it best. The plaintiffs paid for efficient washers, and that's exactly what they received. Therefore, no implied warranty was breached, and there's nothing unjust about their sale. Thank you, Your Honor. Okay. Thank you. Mr. Dickens, we may not be able to see you, but we can hear you, and you are invited to use your rebuttal time. Thank you. It's just a quick rebuttal indeed. Plaintiffs Appellants Baker and Beyer are the only ones with claims against Sears. We happily abandoned those claims, as noted in our briefing. Also, realistically, they don't have any claims. Those are just individual claims, so that's in the amount of $200, and there's also joint and several liability as to Whirlpool. The only claims that were certified were against Whirlpool, so we can happily abandon those. We also want the court to reach the merits. Everyone agrees on that. Now, touching upon the core issues here, though, Whirlpool's lawyer just argued and conceded that, pursuant to their own expert testing, the washers were 92% to 93% up to standard. It's our position, you know, 92% to 93% is not 100%. If I were, again, to buy a 24-carat diamond ring, excuse me, a gold ring, and it was not 24 carats, it was 92% of the way there, you know, maybe 22 carats, that would also be a breach of warranty issue. These utility bills add up. The appliance has a useful life of 10 or 11 years. I also heard a statement that the DOE permitted the washers to remain ENERGY STAR qualified. I encourage the court to look at document A885. That's the January 19, 2011 letter where the DOE says, we confirm the closed washer does not satisfy the ENERGY STAR program's energy efficiency specifications. It actually says, you may respond to this notification no later than February 9, 2011. In your response, you may present to DOE conclusive manufacturing or design evidence or quality assurance information on why this product did not meet the ENERGY STAR program's energy efficiency specifications. This product will remain designated as ENERGY STAR during this 20-day period. I note that Whirlpool did not do that. They did not satisfy the DOE with quality assurance or design evidence as to why the washer met ENERGY STAR standards. And after that 20-day grace period, indeed, the DOE sent the washer to EPA for disqualification, which it was disqualified on. Again, I encourage the court, A885. I also want to refer to A864, which is that second letter from the DOE, also indicating that the model MVWC6ESWW1 does not meet ENERGY STAR requirements. It acknowledged in response this issue about the capacity measurements. The DOE writes, in response, this is the DOE, Whirlpool explained that a discrepancy between DOE's test results and Whirlpool's own testing stemmed from the measurement of the closed container capacity. Whirlpool further explained that it measured capacity for this model based on its interpretation of the DOE test procedure. In July 2010, the department issued guidance clarifying how to measure capacity in a way that differed from Whirlpool's interpretation. The DOE then says, accordingly, DOE is referring this matter to EPA, the brand manager for ENERGY STAR, for appropriate action. And the EPA decided to disqualify the washers. The DOE considered the argument from Whirlpool that there was just, you know, purportedly some kind of misunderstanding about fill level 3 versus fill level 4. The DOE rejected that argument. Whirlpool was an outlier. Again, they were going against the guidance of the trade organization, of which it was a member, AHAM. They were going against their own prior practice of testing at fill level 3 prior to 2004. Whirlpool knew exactly what it was doing. This was not some kind of an issue of innocent confusion. They were part of that trade organization. And the DOE considered those arguments. And the DOE nonetheless decided to send the matter to EPA, which did, in fact, disqualify the washer. This is not some kind of retroactive application. The washer always failed to meet program standards. Whirlpool's own lawyers admit it's only 92% to 93% as efficient as the minimum standards. As a matter of engineering and logic, when washers are ENERGY STAR, they don't always just meet the bare minimum. It's the bare minimum or above. Mr. Dickin, you've gone a ways over time. We'll give you just a moment to wrap up. Okay. Thank you, Your Honor. Lastly, what the ENERGY STAR logo means, I refer to the fact that this is a warranty case. Our plaintiffs are reasonable consumers. They're not electrical engineers. They haven't studied the J-1 test procedure. They see ENERGY STAR. They believe ENERGY STAR means that the washer meets the ENERGY STAR program's requirements. That's what Maytag itself said in its 2009 laundry catalog. All Maytag washers with the ENERGY STAR emblem need to exceed energy efficiency standards set by the DOE. Thank you. Okay. We thank all counsel for their argument today. And we will take this case as well under advisement.